## COBB, Respondent, *v.* WARREN, Appellant.

### (No. 4,818.)

(Submitted May 26, 1922. Decided June 26, 1922.)

[208 Pac. 928.]

*Contracts—Brokers—Real Property—Commissions—Burden of Proof—Evidence—Insufficiency—Nonsuit—Record on Appeal —Printing Required, When.*

Record on Appeal to be Printed, When.
    1.   Subdivision 1 of Rule VI of the supreme court, requiring the transcript to be printed in civil cases where the appellant relies upon the insufficiency of the evidence to justify the trial court's decision, should be observed by counsel where the principal error urged is refusal to grant a motion for nonsuit, a decision of which of necessity involves a review of the evidence.

Real Estate Brokers—Contract—Modification—To be in Writing, When.
    2.   Under section 7519, Revised Codes of 1921, subdivision 6, an agreement authorizing or employing an agent or broker to sell real estate on commission must be in writing, as must also a subsequent modification of its terms, so long as the contract or modification is executory in character, the rule, however, not applying where the contract has been executed.

Same—Commissions—Burden of Proof.
    3.   In an action by a real estate broker to recover commissions on the sale of lands under either an executory or executed contract, he has the burden of proving that he was the procuring cause of the sale: that he produced a purchaser ready, willing and able to buy the lands on defendant owner's terms.

Same—Commissions—Evidence—Insufficiency—Nonsuit.
    4.   *Held,* upon a review of the evidence, that while plaintiff broker first interested one of the two purchasers of the lands in question, it failed to show that he was the procuring cause of the sale, that therefore he was not entitled to recover commissions, and hence that the court should have granted a nonsuit.

*Appeals from District Court, Fergus County; Jack Briscoe, Judge.*

Action by E. F. Cobb against Fred R. Warren. From judgment for plaintiff and an order denying defendant's mo-

2.  Power of legislature to prohibit offering another's real estate for sale without written authority, see note in **Ann. Cas.** 1913C, 727; 12 **L. R. A.** (n. s.) 707.

3.  When real estate broker is considered as the procuring cause of sale or exchange of real property, see note in 139 **Am. St. Rep.** 225; 9 **Ann. Cas.** 433; 44 **L. R. A.** 321.

[64 Mont. 10.]

tion for a new trial, defendant appeals. Reversed and re-manded, with directions.

*Messrs. Gunn, Rasch & Hall* and *Messrs. Belden & De Kalb,* for Appellant, submitted a brief; *Mr. Leonard H. De Kalb* argued the cause orally.

The burden of proving the consummation of the purposes of the agency was upon the plaintiff, and we submit that he has failed to sustain it. The mere fact that a contract was ultimately negotiated between Warren and Liberty supplies nothing, and we need add nothing more here than to invoke the elementary rule on this subject. (9 C. J. 611.) "The fact that the transaction which the broker was authorized to negotiate is finally consummated does not of itself entitle the broker to a commission; he must have been the procuring cause of the transaction, unless there is some agreement between him and the principal to the contrary, else no compen-sation is due. This is true, although the broker had nego-tiated with the person with whom the principal finally con-tracted; the fact that a broker finds a customer with whom the principal closes a contract without the broker's further aid does not give him a right to a commission, unless he was the procuring cause of the transaction."

The plaintiff had no exclusive agency, but the right to sell through other agents was expressly, and the right to sell him-self was impliedly, reserved. There is no pretense that the de-fendant acted in bad faith, but he exercised his prerogative as owner of the land which he had never surrendered, and which he was entitled to exercise without incurring any lia-bility to the plaintiff. Thus it was held by the supreme court of Minnesota, in *Cullen* v. *Bell,* 43 Minn. 226, 45 N. W. 428. (See, also, *English* v. *William George Realty Co.,* 55 Tex. Civ. App. 137, 117 S. W. 996; *Corse* v. *Kelly,* 80 Kan. 115, 101 Pac. 1016; *Wheeler* v. *Beers,* 45 Colo. 547, 101 Pac. 758.)

Whatever authority the listing card gave to plaintiff, it was not for a "definite term," but for an indefinite time, subject

to be terminated at the will of the defendant. The plaintiff had not been given even an exclusive agency, let alone an exclusive right to sell, or offer for sale, and even if a definite time had been fixed for the execution of the power, it was subject to revocation before the expiration of the term and before its execution without the incurring of any liability. (2 Mechem on Agency, par. 2446; *Laux* v. *Hogl,* 45 Mont. 445, 123 Pac. 949; on rehearing, on page 453; *Brown* v. *Pforr,* 38 Cal. 550; *Dreyfus* v. *Richardson,* 20 Cal. App. 800, 130 Pac. 161; *Kolb* v. *Bennett Land Co.,* 74 Miss. 567, 21 South. 233; *Jayne* v. *Drake* (Miss.), 41 South. 372; *Walker* v. *Dennison,* 86 Ill. 142; *Ingold* v. *Symonds,* 125 Iowa, 82, 99 N. W. 713; *Smith* v. *Preiss,* 117 Minn. 392, Ann. Cas. 1913D, 820, 136 N. W. 7.)

*Messrs. Blackford & Huntoon* and *Messrs. Norris, Hurd & Rhoades,* for Respondent, submitted a brief; *Mr. Edwin L. Norris* argued the cause orally.

When the broker's efforts have resulted in interesting a prospective purchaser in negotiations for a sale, the principal cannot, by taking matters in his own hands and completing the sale, escape liability to the broker. Respondent's duty was discharged when he found a purchaser, who was accepted by the appellant and with whom appellant negotiated a sale. When he sold to Liberty and his associates, he became liable for respondent's commission. (Mechem on Agency, 2d ed., sec. 2447; *Laux* v. *Hogl,* 45 Mont. 445, 123 Pac. 949; *Shober* v. *Dean,* 39 Mont. 255, 102 Pac. 323; *Shober* v. *Blackford,* 46 Mont. 194, 127 Pac. 329; *Branch* v. *Moore,* 84 Ark. 462, 120 Am. St. Rep. 78, 105 S. W. 1178; *Tyler* v. *Parr,* 52 Mo. 249; *Blumenthal* v. *Goodall,* 89 Cal. 251, 26 Pac. 906; *Nicholas* v. *Jones,* 23 Neb. 813, 37 N. W. 679; *Gresham* v. *Connally,* 114 Ga. 906, 41 S. E. 42; *Hallack Co.* v. *Hinckley,* 19 Colo. 38, 34 Pac. 479.) Nor does the fact that the owner sells to the customer of the broker, and on different terms from those upon which the broker was negotiating, deprive the

broker of his commission. (*Shober* v. *Blackford*, 46 Mont. 194, 127 Pac. 329; 9 C. J. 600.)

Where broker's efforts to obtain a purchaser are approaching success, the principal having knowledge thereof cannot revoke the broker's authority until he has had a reasonable time for performance. Respondent's negotiations with Liberty began in the latter part of November or early part of December, 1913. The property to be sold was exhibited to Liberty by respondent. Several conferences were held between them, at one of which appellant and Liberty were introduced, and the matter of sale discussed. Thereafter respondent continued his efforts to induce Liberty to purchase. The sale was made on the twenty-eighth day of January, 1914. From some source respondent obtained information about the middle of January that Weaver would become interested with Liberty, and that they would purchase, and so notified appellant. That information alone was sufficient to prove to appellant that respondent was still active in the negotiations. In these circumstances the court was justified in finding that the negotiations were plainly approaching success, and that the sale being made by the principal during that time entitled respondent to his commission. (*Laux* v. *Hogl*, *supra;* 9 C. J. 600; *Handley* v. *Schaffer*, 177 Ala. 636, 59 South. 286; *Weisels etc. Co.*, v. *Epstein*, 157 Mo. App. 101, 137 S. W. 327; *Peach River Lbr. Co.* v. *Montgomery*, 51 Tex. Civ. App. 478, 115 S. W. 87; *Tyler* v. *Parr*, 52 Mo. 249.)

Where, as here, a broker is the cause of bringing the owner and a purchaser together and thereafter a sale on terms satisfactory to the owner is effected by another broker, the owner is liable to the first broker. (*Beougher* v. *Clark*, 81 Kan. 250, 27 L. R. A. (n. s.) 198, 106 Pac. 39; *Sullivan* v. *Tufts*, 203 Mass. 155, 89 N. E. 239; *Rigdon* v. *More*, 226 Ill. 382, 80 N. E. 901; *Wood* v. *Wells*, 103 Mich. 320, 61 N. W. 503; *Smith* v. *Truitt*, 107 Mo. App. 1, 80 S. W. 686; *Jennings* v. *Trummer*, 52 Or. 149, 132 Am. St. Rep. 680, 23 L. R. A. (n. s.) 164, 96 Pac. 874; *Elmendorf* v. *Golden*, 37 Wash. 664, 80 Pac. 264;

see, also, *Dowling* v. *Morrill*, 165 Mass. 491, 43 N. E. 295, a case presenting nearly the same situation as the case at bar.)

It is not material, so far as the recovery of commission is concerned, whether the property was actually sold at the price listed with the broker. It is sufficient if it was sold by the owner on terms acceptable to him. Reduction of the price made by the owner to the purchaser does not deprive the broker of his commission. (*Williams* v. *Bishop et al.*, 11 Colo. App. 378, 53 Pac. 239; *Schlegal* v. *Allerton*, 65 Conn. 260, 32 Atl. 363; *Davis-Fisher Co.* v. *Hall*, 182 Mich. 574, L. R. A. 1915A, 1224, 148 N. W. 713; *Hill* v. *McCoy*, 1 Cal. App. 159, 81 Pac. 1015; *Kalley* v. *Baker*, 132 N. Y. 1, 28 Am. St. Rep. 542, 29 N. E. 1091; *Plant* v. *Thompson*, 42 Kan. 664, 16 Am. St. Rep. 512, 22 Pac. 726; *O'Connell* v. *Casey*, 206 Mass. 520, 92 N. E. 804; *Smith* v. *Anderson et al.*, 2 Idaho, 537, 21 Pac. 412; *Hubachek* v. *Hazzard et al.*, 83 Minn. 437, 86 N. W. 426; *Smith* v. *Truitt*, 107 Mo. App. 1, 80 S. W. 686; *Loomis* v. *Broadus et al.* (Tex. Civ. App.), 134 S. W. 743; *Smith* v. *Sharpe*, 162 Ala. 433, 136 Am. St. Rep. 52, 50 South. 381; *Hess* v. *Hayes*, 146 Iowa, 620, 125 N. W. 671; *Cobb* v. *Dunlevie*, 63 W. Va. 398, 60 S. E. 384; *Donk Bros. etc. Co.* v. *Stroetter*, 229 Ill. 134, 82 N. E. 250; *Doub & Co.* v. *Taylor*, 48 Okl. 713, 150 Pac. 687; *Graves* v. *Hunnicut*, 8 Ga. App. 99, 68 S. E. 558.)

MR. JUSTICE GALEN delivered the opinion of the court.

This case is predicated upon plaintiff's alleged right to commission earned upon sale of certain lands and personal property thereon in Fergus county, belonging to the defendant. The cause of action is stated by plaintiff in two counts, the first on contract, and the second on the *quantum meruit*. Upon issues joined, the cause was tried to the court without a jury. The court found and determined all of the issues in favor of the plaintiff, and judgment was given and made for the plaintiff in the sum of $23,758.20, together with costs.

The appeal is from the judgment and order denying defendant's motion for a new trial.

It appears that the defendant listed his property for sale with the plaintiff, and at the time executed a memorandum agreement, reading as follows:

"No. ———.               "Warren, Fred ...... July 18, 1912.

"Cobb & Harris are authorized from this date, and until withdrawn in writing, upon ten days' notice, to offer for sale all his land in township 14 north, range 13 E., in Tp. 13 N., R. 13 E., and in Tp. 13 N., R. 14 E., and all personal property included for the price of $35 per acre net. Will accept in first payment $———, one-third cash, and balance in 5 annual payments on or before at 7%. They will have to pay expenses from date. I agree to furnish abstract of title and pay you all money above $35 per acre as commission on the selling price. No pay without sale, and right reserved to list with other agents.

                              "Fred R. Warren."

The plaintiff bases his right of action in the first count of his complaint upon a claim of performance of the contract after a modification thereof, whereby the selling price was reduced to $30 per acre net to the defendant, for the land and personalty. It is alleged that, on or before the date of the memorandum, the defendant owned, possessed, and controlled 6,937 acres of land in the township described in the listing agreement, situate in Fergus county, Montana, and in addition owned a large amount of personal property, consisting of farm machinery, livestock, *et cetera*, which he desired to sell, and in consequence made the contract in writing, above set out, with the plaintiff. It is further alleged that he is the same person named Cobb in such contract, and that the other person, named Harris, is one J. B. Harris, who was formerly associated with plaintiff as his copartner in the brokerage business in Fergus county, Montana; that such copartnership was dissolved more than two years before the date of and the making and delivery of the contract above set forth; that

one of the copartnership blank form contracts of Cobb & Harris, with the firm name printed thereon, was used in drafting the contract, signed, and delivered by defendant to plaintiff, and by oversight and mistake the sign "&" and the name "Harris" were not stricken therefrom nor the initials of plaintiff "E. F." prefixed to the surname "Cobb," but that in truth and in fact the contract was made and intended by both parties to be with the plaintiff alone. It is averred that, upon the signing and delivery of the contract, plaintiff accepted it, listed the property for sale, adding to the net price specified $2.50 per acre for his commission in handling the property, and so notified the defendant. It is alleged that plaintiff offered the property for sale at $30 per acre net to the defendant, adding thereto plaintiff's commission; that plaintiff found a purchaser for the property, and notified the defendant not to sell the property to purchaser for less than $32.50 per acre, but that the defendant made sale of the property at a price and upon terms to him satisfactory, though different from those agreed upon by the plaintiff and defendant, without plaintiff's knowledge at the time of the sale of the terms or price obtained for the property. It is alleged that the property described in the complaint, except 480 acres withdrawn, was by the plaintiff brought to the attention, among others, of one J. I. Liberty, who was either desirous of purchasing it or procuring others with him so to do, and that plaintiff introduced Liberty to the defendant as a prospective purchaser. It is further alleged that on the third day of December, 1913, plaintiff conveyed Liberty to defendant's lands, and showed the property to the latter for the purpose of making a sale thereof to him; that Liberty interested one I. Weaver, in the purchase of the property, and that Liberty and Weaver thereupon entered into negotiations with the defendant to purchase the property, resulting in a sale by the defendant to Liberty and Weaver in the month of January, 1914, without notice to the plaintiff. The second count of the complaint follows the allegations of the first. The prayer is for a reformation of the contract to

read "E. F. Cobb" instead of "Cobb & Harris," and for $16,-142.50 commission, with interest from February 1, 1914, at eight per cent per annum and costs.

There are many errors assigned, but, in our opinion, but one question need be considered decisive of the case, *viz.*: Did the court err in overruling defendant's motion for a nonsuit? The motion assigned, among other grounds, that "(1) The plaintiff has failed to make a case either by pleading or proof to entitle him to any recovery from the defendant."

At the outset counsel for the appellant are censured for failure [1] to comply with the rules of this court in the preparation of the transcript on appeal. Subdivision 1 of Rule VI (59 Mont. xxxix, 202 Pac. viii) has been entirely disregarded. This rule requires the transcript to be printed in civil cases wherein the insufficiency of the evidence to justify the trial court's decision is relied upon; and, in this case, the principal, and in our opinion the determinative, question presented on this appeal requires a review of the evidence to determine whether a nonsuit should have been granted on defendant's application.

Error specified for failure to grant a motion for a nonsuit presents for review the "insufficiency of the evidence." Manifestly the rule is intended for a useful purpose, namely, to save the eyes of members of this court so far as possible in necessary reading, and to provide readable copies for the use of each member of the court. Were the penalty of dismissal of the appeal determined upon, as authorized (subd. 6 of Rule VII), a gross injustice would result to the appellant, due entirely to his counsel's failure to observe the rules and practice before this court. Counsel should familiarize themselves with the rules of this court, and apply them in all matters before this court. Laxity in the preparation of records on appeal, especially utter disregard of the court's rules, gives a bad first impression which may unconsciously be reflected in the court's decision, or lead to the more disastrous consequence of a dismissal of the appeal without consideration of its merits. There must be, and is, a limit

to the patience of this court, and again the members of the bar are cautioned that the rules of this court "should be honored by observance rather than dishonored by breach." (*Brockway* v. *Blair*, 53 Mont. 531, 165 Pac. 455; *Wing* v. *Prasher*, 59 Mont. 10, 194 Pac. 1106; *Cornner* v. *Hamilton*, 62 Mont. 239, 204 Pac. 489; see, also, *Samuell* v. *Moore Mercantile Co.*, 62 Mont. 232, 204 Pac. 376.)

It not being necessary for decision of this case, we express no opinion as to whether a reformation of the contract so as to have it run to the plaintiff, "E. F. Cobb," rather than "Cobb & Harris," without making J. B. Harris a party defendant, nor as to whether the description contained in the listing agreement is sufficient to identify the lands offered for sale.

Subdivision 6 of section 7519, Revised Codes of 1921, requires an agreement to be in writing authorizing or employing an agent or broker to sell real estate on commission. This provision is mandatory, and must be followed as respects either the original agreement or a subsequent modification of the terms thereof. So long as the contract or modification is executory in character, its terms may only be modified by a writing. A writing being necessary in the first instance as a basis of recovery, where there is a subsequent change of terms agreed upon it must also be reduced to writing, so long as unexecuted. But in this case plaintiff bases his right of recovery upon an executed agreement modifying the original written contract.

He had right of recovery on this theory in the event he was able to establish the modification either "by a contract in writing, or by an executed oral agreement, and not otherwise." (Sec. 7569, Rev. Codes 1921.) The burden of proof rested on the plaintiff, under either the terms of the original written agreement or the modification thereof alleged to have been executed, to show that he was the procuring cause of the sale. If he did not actually produce a purchaser

ready, willing and able to buy the property, he could not recover in either event.

The plaintiff had the burden to prove by a preponderance of the evidence the production by him of a purchaser *ready, willing and able* to buy the land on the *defendant's terms* (*Laux* v. *Hogl,* 45 Mont. 445, 123 Pac. 949; *Shober* v. *Blackford,* 46 Mont. 194, 127 Pac. 329; *Newman* v. *Dunleavy,* 51 Mont. 149, 149 Pac. 970; *Wright* v. *Bowlus,* 62 Mont. 322, 205 Pac. 210) and, if he failed so to do, the district court was in error in not granting defendant's motion for a nonsuit. In the case last cited we said, and now reiterate as the correct principle, that "As a general rule a broker is not entitled to compensation until he has performed the undertaking assumed by him; and, in the absence of any contrary provision in his contract, it matters not how great have been his efforts nor how meritorious his services; if he is unsuccessful in accomplishing the object of his employment, he is not entitled to compensation. (9 C. J. 588.) And, obviously, where a broker's commissions are expressly conditioned upon the consummation of contract to be negotiated, it must be performed by the parties thereto to warrant the broker in recovering his remuneration. (4 R. C. L. 311.)"

In order to entitle a broker to his commissions, he must accomplish that which, by agreement, he undertook to do, and, as a rule, nothing short of performance will be deemed sufficient on his part. (4 R. C. L. 46; Rapalje on Real Estate Brokers, sec. 59.)

Professor Mechem, in his splendid treatise on Agency (2d ed., vol. 2, sec. 2427), states the correct rule applicable, in the following language: "Commissions are ordinarily payable only for results, and are not earned by efforts or attempts, however praiseworthy, if they were not the efficient cause of the result contemplated. For the same reason, no recovery can ordinarily be had for part performance or upon a *quantum meruit* for work done but less than full performance."

[64 Mont. 10.]

The land in question was sold by the defendant, Warren, and his wife to Joseph I. Liberty and I. Weaver, the latter part of January, 1914, at $31.50 per acre net to the owners. After the sale Warren, though denying liability to pay Cobb a commission, offered to pay the latter $1,000 for services rendered rather than to have a lawsuit. Cobb demanded $2.50 per acre commission, which Warren refused to pay, as a result of which this action was instituted.

We have reviewed the entire record, and are of opinion that [4] the plaintiff failed to establish his case. He did not show, as he was required to do in order to entitle him to a recovery, that he was the *procuring cause* of the sale of the lands in question. From the testimony offered in support of plaintiff's case, it appears that the plaintiff was engaged in the real estate brokerage business in Lewistown between 1910 and 1916, in which latter year he removed to Geyser. During the time he was engaged in business in Lewistown Anna Williams was employed as a clerk in his office, kept the books, took listings of land, and had charge of the office in his absence. The plaintiff became acquainted with the defendant Warren in 1911, and had occasion in either March or April, 1912, to visit the Warren ranch, at a time prior to the execution of the listing agreement. On July 18, 1912, the defendant Warren visited the office of the plaintiff in Lewistown, and, the plaintiff being absent therefrom, the defendant listed the lands in question for sale with Anna Williams, who was then in charge of the plaintiff's office, the contract form hereinabove set forth being used. Shortly thereafter the plaintiff visited Warren's lands, examined them, and the personal property included in the listing agreement, advertised the same for sale, prepared a prospectus, and interested several people in an endeavor to consummate a sale of the property under the listing contract. On the occasion of plaintiff's first visit to the Warren ranch, after the date of the execution of the listing agreement, he advised Warren that he (Cobb) would have to have $2.50 per acre commission, and that the land would be

[64 Mont. 10.]

priced at $37.50 per acre, and it was so priced in offers made prospective purchasers.

Plaintiff brought several persons to examine the property with a view of purchasing the same in the years 1912 and 1913, among them being one Joseph Liberty, the last of the persons to whom Cobb exhibited the property.

The plaintiff Cobb testified: That, in the fall of 1913, he, not having been able to make a sale of the Warren lands at the price listed, asked Mr. Warren if he would be willing to take $30 per acre net for the ranch, and the latter replied: "You show me the buyer." Further he testified: That he asked Warren if he should go ahead and sell the ranch for $30 net, and Warren said to him, "Go ahead." "We were talking about the lands, and we hadn't been able to sell it for $35. I finally said to Mr. Warren, 'Well, now, will I go ahead and sell this land for $30 net to you?' and he said 'Yes.' No, sir; there was nothing in writing to that effect." Further he testified: "I told Warren that we should price the land at $32.50 and I was to have $2.50 commission. With reference to that matter he said, 'All right.' I don't remember of the matter of the commission coming up after I told him I had reduced the price to $30 per acre. Yes, sir. I remember just once the matter of commission. Yes, sir. Some time after that I showed the land to some person. As to the conversation in which Mr. Warren told me to reduce it to $30 per acre, I don't remember but once showing it to parties; that was to Mr. J. I. Liberty. * * * I did price this land to somebody on a basis of $30 net to Mr. Warren. That was Mr. Liberty. Yes, sir; the price that I made to Liberty was $35. No, sir; I did not make any other price than $35. No, sir; I did not make any contract with Liberty on the basis of $35 per acre or on the basis of $30 per acre net to Warren. No, sir; I never made a contract with Mr. Liberty at all. * * * At the time that I met Mr. Liberty at Hobson pursuant to a previous appointment, and took him over to the Warren ranches, the property described in the com-

plaint in this case, my purpose in so doing was to show him the land. No, sir; before I arrived at the ranch I had not heard of any proposition from Mr. Liberty that he and I enter into negotiations with Mr. Warren for the purchase of the land. Yes, sir; there was something said by Mr. Liberty during the time that I was showing him over the land or on our way back to Hobson relating to that matter. Mr. Liberty began that line of conversation. I said that I wouldn't go into any company. I told Mr. Liberty I wouldn't purchase the land with him. Mr. Liberty made me the proposition that —he says, 'The land is cheap, and let us, you and I, buy it together; you put up $2,500 and we will buy the ranch off Warren,' and I said no, I didn't want to buy the ranch. Well, we were on the road home from the ranch to Hobson when I told him that. I think it was on the road from the ranch to the town when he first made the proposition to me that he and I go in together and purchase the ranch. I said at the time we was talking about it that I wouldn't go in. * * * When I next saw Mr. Liberty after I had shown him over the land, after I left him at Hobson, and taken the train to go elsewhere, I think that proposition was mentioned again to me by him. I think we were in the office at that time. At that particular time he proposed that we go east and organize this company. I said to him that I wouldn't go into the proposition. I don't remember of any other times than that after I left him in Hobson that I discussed that matter with him. No, sir; he did not ever say to me that he would not deal any further concerning the land—anything to that effect. With reference to the time when I, in my office, told Mr. Liberty that I would not go into the matter of organizing a company, it was before that I saw him and Mr. Warren together in my office. No; I mean the conversation occurred before I saw Warren and Liberty in my office. Yes, sir, the conversation between Mr. Warren and Mr. Liberty and myself; I would say it would be a week or so. Yes, sir; at the time that these two persons and I were in the office there

[64 Mont. 10.]

was as the subject of conversation the Warren ranches mentioned. It was discussed. No, sir; at that time Mr. Liberty didn't say anything of the fact to me or Mr. Warren that he would not go on with the matter of purchasing the property. Yes; the conversation had to do with his interesting people with him in purchasing the ranch. * * * Yes, sir; Liberty was apparently willing to buy at $35 an acre, providing he could organize a company to take it over. Why, we all knew that Mr. Liberty couldn't buy this ranch himself. Yes, sir; when I took Liberty out to show him the land, I knew that he couldn't buy the land himself. * * * Yes; Liberty was desirous of interesting me in organizing a company for the purpose of selling the land or buying it. Yes, sir; every proposition that Liberty put up to me about going in with him to buy the place I turned down flatly. Yes, sir; I told him that I would not consider it at all. * * * As I remember that conversation, in reference to the fact that there was ill feeling between Weaver and myself growing out of this Geyser proposition in which Harlow bought some land from the company, I think I brought it up myself, but I said, when Joe made me the proposition to go in the company, I said I wouldn't have anything to do with Weaver. No; it was not further said that Weaver wouldn't have anything to do with me. No, sir; I never heard of Weaver's side of the controversy—that he wouldn't be interested in any deal that I was interested in. Yes, sir; my attitude was that I would not be associated with Weaver in a deal.''

In support of his case, plaintiff further stated that he went East on business, and while en route wrote a letter on the train, addressed to the defendant, about January 12, 1914, which was properly addressed and mailed at Mobridge, South Dakota. He was permitted to testify as to its contents, the original not having been produced on demand, and he not having preserved a copy thereof. He says that he ''told Mr. Warren that Mr. Weaver was coming out to look at the

ranch, and I was sure they would buy it, and not to accept less than $32 an acre for it." In this connection he explained:

"There was no information in my possession by reason of which I made the statement to Mr. Warren (in the letter) that Mr. Weaver was coming out except that Mr. Liberty told me."

Before his return from his trip east, and while in Chicago, he received a telegram from the defendant Warren, dated February, 1914, which was in evidence, reading: "Ranch sold. Fred Warren."

Mr. Joseph I. Liberty, as a witness on behalf of the plaintiff, said that he was over the lands in question the latter part of November or the fore part of December, 1913, in company with the plaintiff, Cobb, and on cross-examination, in explaining fully his business transactions had with the plaintiff, he stated in part: "Well, after we looked it over, I told Mr. Cobb I thought it was a pretty good buy, and I asked him what the price was, and he said $35 an acre, and I said, 'That is all right.' He gave me a listing—that is he told me what personal property went with the ranch—and I said: 'Let us give Mr. Warren $5,000; give him $2,500 apiece. We will tie it up, we will go east, and we will put it into a company'—and Mr. Cobb said he wouldn't put any money in on the lands, and I said: 'Well, I won't work five minutes on a ranch that I haven't got any option that I can deliver in order to get the money raised.' Then Mr. Cobb informed me that he had an option, and he said, 'Nobody can buy that ranch but me,' and he said, 'We will get the lands if we can get the money,' and I said, 'Then, if that is the condition, then all right.' I said, 'You get back and get your duds on, come to Wisconsin with me, and we will pay our own expenses, and we will organize this company, and we will split the commission.' He refused to do that. Yes; he was going to add $5 an acre to the $35. I asked Mr. Cobb if there was any commission out of that, and he said, 'No,' that was the flat price, $35, and I said, 'We can either add $5 an acre or $2.50 as we see fit.' I think it was some time in December. * * * I think it was

the next morning I returned to Lewistown, and I saw Mr. Cobb the following day in his office. Besides myself and Mr. Cobb, Miss Williams and Mrs. Cobb were present. * * * No; I didn't see Mr. Warren there any time during the visit I had with him. No; I don't know as a fact where Mr. Warren was at that time; I didn't know Mr. Warren at that time. At the office, Mr. Cobb and I discussed the matter of going east and putting this into a company; Mr. Cobb told me he couldn't do me any good, and I said: 'That is all right; you might not be able to do me any good, but you can't do me any harm. You will be with me. You will act as the agent in buying this land. There is a good many ways of buying a piece of land.' And I says: 'If we don't raise this money in ten days among my friends, whether we do anything or not, if we do raise this money, you pay your own expenses and I will pay my own expenses, and we will split the commission.' By the commission I meant the difference between what we were paying for the ranch, $35, and the price we was paying on the land. I don't believe that amount had been determined by Mr. Cobb and myself up to that time.

"Q. Well, what did Mr. Cobb say as to this proposition, Mr. Liberty? A. He told me that he wouldn't go on back east, and that I could go on and raise the money and come back here with my people and show them the land. I told him my people wouldn't have to come down here at all. They had invested in different ranches with me and they would take my sayso. * * * And to that he said he wouldn't go, and I said: 'It is all off so far as you and I are concerned. I won't do this work and split commissions.' There was no other or further conversation between Mr. Cobb and myself concerning the Warren land right at that time. I don't remember just when it was that I next had a conversation with Mr. Cobb on this subject matter, but it was within a week, anyway. We talked the matter over again, and Mr. Weaver came into the deal then. Mr. Weaver was a friend of mine that had been working with me in land deals here, and I didn't care to work with him. He was at Madison. On this

occasion I submitted to Mr. Cobb that we would write to Mr. Weaver—I would write to Weaver and see if we could get him to go in with us, and would help me to raise this money over there, and to split three ways between Mr. Cobb and myself and Mr. Weaver, and I got a letter back to that effect. At that meeting I told Mr. Cobb I would drop Weaver and for him to come with me, and we would take this commission quick, and he refused to do that, and I left the office. I told him then that I was through with the deal. Yes, sir; that was the last conversation that I had with Mr. Cobb. No, sir; during the conversation that I had with Mr. Cobb on the subject matter of the Warren ranch, there was no price made to me lower than $35 per acre.

"The Court: Let me inquire—this was after the alleged conversation between Mr. Cobb and Mr. Warren about being unable to sell it at $35 net?

"Mr. Belden: Yes; this was in December, 1913.

"The Court: I had forgotten the date of the other conversation.

"Mr. Rasch: The conversation testified to by Mr. Cobb was in November, 1913.

"Witness (Continuing): After that I first saw Mr. Warren, the defendant in this case, the day I bought the land. Mr. Warren was introduced to me the day I bought the land, at Judith Gap; I went there to meet Mr. Weaver to look over some lands, and Jack Waite, the president of the Fergus County Bank, and Mr. Weaver and this gentleman got off the train. Mr. Weaver shook hands with me—I went there to meet him—and I reached over to shake hands with Mr. Waite, and at that time Mr. Weaver said, 'Joe, this is Mr. Warren.' * * * Yes, sir; this occasion at Judith Gap was the first time that I had met Mr. Warren, the defendant in this case; I was introduced to him there. Yes, sir; he was presented by Mr. Waite. No, sir; Mr. Cobb was not present at that time. After meeting Mr. Warren at Judith Gap we went to Hobson, and from there to Mr. Warren's ranch. When I say 'we' I mean Mr. Weaver and myself and Mr. Warren. When we

got to the Warren ranch we looked over the property. After that Mr, Warren drove us back to Hobson—I don't remember whether Mr. Warren drove us back or whether we hired a car at Hobson; I just don't remember, but we went back to Hobson alone. I think that was on the twenty-seventh day of December, and we made the contract, I think, on the 28th. Yes, sir; a reference to the contract would refresh my memory as to the date. That is the date in Plaintiff's Exhibit 7 in this cause, No. 5636. Yes, sir; this Exhibit 7 is the contract about which I gave testimony on Saturday. No, sir; Mr. Cobb was not present at that time when this contract was entered into. Yes, sir; as I recall it, this contract was made on the day that it bears date, the twenty-eighth day of January, 1914. * * * I was looking for a ranch for the purpose of organizing a company.''

It will be noted that the plaintiff did not establish, nor could he establish, the fact of having made a sale of the lands under the terms of the listing agreement, and the proof is wholly insufficient to show a sale made by the plaintiff, or by his efforts, to Liberty or Liberty and Weaver, conceding the written contract to have been modified by oral agreement. The sale was consummated by Warren alone, and, although Cobb first interested Liberty in the purchase of the property, the evidence falls far short of showing Cobb to have been the procuring cause of the sale made to Liberty and Weaver.

The motion for a nonsuit should have been granted, plaintiff having failed to show himself entitled to commission on the sale. The judgment and order are reversed and the cause is remanded, with directions to enter judgment in favor of the defendant.

*Reversed and remanded.*

ASSOCIATE JUSTICES FARR, COOPER and HOLLOWAY concur.

HONORABLE ROY E. AYERS, District Judge, sitting in place of MR. CHIEF JUSTICE BRANTLY, deeming himself disqualified, takes no part in the foregoing decision.